# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 12-62144-CV-ROSENBAUM

THE COSAC FOUNDATION, INC.,
d/b/a The Homeless Voice,

      Plaintiff,

v.

CITY OF PEMBROKE PINES and
DAN GIUSTINO, in his official capacity
as Chief of Police for the City of
Pembroke Pines,

      Defendants.

_____/

### <u>ORDER</u>

#### *Introduction*

This matter is before the Court upon Defendant City of Pembroke Pines's ("City") Motion for Partial Summary Judgment[1] [D.E. 7] and Defendant Dan Giustino's Motion for Summary Judgment [D.E. 8]. The Court has reviewed the parties' briefs and all supporting and opposing filings and is otherwise fully informed in this matter. For the reasons set forth below, the Court grants both Defendant City of Pembroke Pines's Motion for Partial Summary Judgment and

---

[1]Although Defendant City of Pembroke Pines's motion was styled as requesting summary judgment on all claims made by Plaintiff, the City has not in any way addressed Plaintiff's contention that Chapter 113 of the Pembroke Pines Code of Ordinances contains a permitting scheme for charitable solicitations that violates the First Amendment and Equal Protection rights of The Homeless Voice. *See* D.E. 1 at 4. The Court has therefore construed the City's Motion as one requesting partial summary judgment. Accordingly, Plaintiff may proceed on its claim based on the City's permitting scheme.

Defendant Dan Giustino's Motion for Summary Judgment.

*Background*

## I. Procedural Posture

Plaintiff Cosac Foundation, Inc., d/b/a The Homeless Voice, brought an action pursuant to 42 U.S.C. § 1983 for damages and injunctive relief challenging the constitutionality of the City of Pembroke Pines's ordinance regulating roadway canvassing and solicitation. *See* D.E. 1. Defendants City and Giustino each filed motions to dismiss [D.E. 7, D.E. 8], which this Court converted to motions for summary judgment pursuant Rule 12(d), Fed. R. Civ. P. *See* D.E. 22.

## II. Material Facts

Plaintiff Cosac Foundation, Inc. ("Cosac"), is a nonprofit, tax-exempt corporation that produces *The Homeless Voice*, a street newspaper that seeks to educate citizens about issues of homelessness and poverty.[2] D.E. 1, ¶ 4-5. It also operates a vendor program for the distribution of its newspaper in order to give job skills and meaningful work to homeless persons. *Id*. at ¶ 5. Individual vendors distribute *The Homeless Voice* in the medians of roadways and on sidewalks. Although the newspaper is free, vendors seek voluntary donations from the public. *Id*. Cosac is incorporated in the State of Florida, with its principal place of business in Broward County. *Id*. at ¶ 4.

Defendant City of Pembroke Pines is a duly incorporated municipality within the State of Florida. *Id*. at ¶ 8. Defendant Dan Giustino is the City of Pembroke Pines Chief of Police and the Department Director for the Pembroke Pines Police Department. *Id*. at ¶ 9. Police Chief Giustino

---

[2] For purposes of clarity, "*The Homeless Voice*" refers to the newspaper publication itself, while "The Homeless Voice" refers to Plaintiff.

is sued in his official capacity only.  *Id*.

On September 5, 2012, the City of Pembroke Pines enacted its Right-of-Way Solicitors and Canvassers Ordinance, Ordinance 1734 ("Ordinance").  *Id*. at ¶ 8. The Ordinance provides, in pertinent part,

> (C)     Prohibited Roadways: It shall be unlawful for any person to act as a right-of-way canvasser or solicitor on Pines Boulevard, Pembroke Road, University Drive, Sheridan Street, Dykes Road and Flamingo Road or within 200 feet from the lateral curb or boundary line of any intersection located on the roadways identified in this subsection.

D.E. 1-3 at 12.  The Ordinance defines "right-of-way canvasser or solicitor" as follows:

> (A)     Definitions.  For the purpose of this section, "right-of-way canvasser or solicitor" shall mean any person who sells or offers for sale any thing or service of any kind, or who seeks any donation of any kind, or who personally hands or seeks to transmit by hand or receive by hand any thing or service of any kind, whether or not payment in exchange is required or requested, to any person who operates or occupies a motor vehicle or any kind, which vehicle is engaged in travel on or within any portion of any of the streets or roadways in the City, whether or not such vehicle is temporarily stopped in travel lanes of the road.

*Id*. at 8-9. This definition specifically exempts persons who lawfully display signs: "The term shall not apply to any person who merely holds or displays a sign lawfully permitted to be displayed by a person as long as there is no entry by such person or sign into any portion of the roadway or its median." *Id*.

The preamble to the Ordinance provides,

> . . . [T]he City Commission of the City of Pembroke Pines has a significant interest in protecting the health, safety and welfare of pedestrians and drivers in the City, and ensuring the free flow of traffic within the City; and

. . . [T]he City Commission finds that a dangerous condition exists when person(s) approach vehicles and vehicle travel lanes to solicit employment, business, or charitable contributions from drivers traveling on major streets and roadways; and

. . . [T]he City's professional staff and police department has analyzed each of the major roadways within the City and has determined that certain roads, as specified herein, pose the greatest threat to public safety and the free flow of traffic in connection with the activities of right-of-way solicitors and canvassers; and

. . . [T]he City's Police Department has specifically analyzed the number of traffic accidents within the City from 2005 through 2010 and prepared a map detailing their findings . . .

. . . [A]ccording to the Department of Florida Highway and Motor Vehicles (the "Department"), the number of citations issued for aggressive and careless driving increased from 3,815 in 2003 to 23,180 in 2010; and

. . . [A]ccording to the Department, Broward County is second only to Miami-Dade County for the number of Uniform Traffic Citations issued in 2010; and

. . . [T]he City Commission of the City of Pembroke Pines deems it to be in the best interests of the citizens and residents of the City to prohibit right-of-way solicitors and canvassers on certain major streets located in the City.

*Id*. at 6-8. In explaining the purpose of the Ordinance, the Ordinance itself states, "The City Commission of the City of Pembroke Pines desires to adopt an ordinance restricting right-of-way canvassers and solicitors to certain streets and roadways located in the City because such canvassers and solicitors pose a danger to themselves and the public at large by interfering with the safe movement of normal vehicular traffic . . . ." D.E. 1-3 at 9.

The Ordinance further makes specific findings in support of itself:

(b)     According to the Florida Department of Highway Safety and Motor Vehicles 2007 Florida Traffic Crash Statistics Report,

4

530 pedestrians were killed on Florida roadways in 2007; 65 of those pedestrians were killed on roadways in Broward County; and

(c)   As reported in the USDOT National Highway Traffic Safety Administration's June 2008 National Pedestrian Crash Report, the City of Pembroke Pines experienced 2 pedestrian crash deaths in 2006 alone.

(d)   Based upon statistics collected by the Surface Transportation Policy Project, the Miami-Fort Lauderdale area is one of the most dangerous areas in the United States for pedestrians; and

(e)   Numerous types of right-of-way canvassers and solicitors may seek to operate within the City of Pembroke Pines, including, but not limited to, children, adolescents and adults who seek to collect money for school and community activities; vendors who sell flowers, newspapers and other products; and people who seek donations or distribute written information; and

(f)   Right-of-way canvassers and solicitors approach motorists and passengers in motor vehicles engaged in travel on roads, and are particularly susceptible to and vulnerable to serious injury, or death due to the speed and number of motorists who operate vehicles on busy roads within the city; and

(g)   Roads are primarily designed for vehicular traffic and are not suited to safely accommodate right-of[-]way canvassers and solicitors; and

(h)   According to a local newspaper article published in 2003, 29 right-of-way canvassers/solicitors have been seriously injured and at least 14 more have been killed by motor vehicles during a 15 year period; many of those deaths occurred while the canvasser/solicitor was sitting or standing in a median or on the side of the street (including a *Sun-Sentinel* newspaper vendor who was struck by a car while carrying papers on U.S. 1 and Broward Boulevard in Fort Lauderdale on July 30, 2000; a *Miami Herald* newspaper vendor who was standing on the median at Federal Highway and Stirling Road on May 23, 2002; and a *Miami Herald* newspaper vendor who was selling papers on the side of the street at Stirling Road and U.S. 441 on August 7, 2002); and

5

(i)     The presence of right-of-way canvassers and solicitors interferes with the safe movement of normal vehicular traffic; and

(j)     The road network in the City is substantially burdened by a high volume of traffic, and road design frequently includes complex vehicle turn movements that demand a driver's strict attention; and

(k)     It is the intention of the City Commission to use the least restrictive means to advance the significant governmental interests of traffic safety and public safety and, consequently, the City staff analyzed each of the major roads within the City and determined that [Pines Boulevard (State Road 820), Pembroke Road (State Road 824), University Drive (State Road 817), Sheridan Street (State Road 822), Dykes Road, and Flamingo Road (State Road 823)] present an increased and significant danger for use by distracted drivers, pedestrians and right-of-way canvassers and solicitors and pose the greatest threat to traffic and public safety in reference to activities and use by right-of-way canvassers and solicitors, and therefore the City Commission has determined that such activities and use by right-of-way vendors and solicitors shall be prohibited on [these] roads . . . ; and

(l)     It is the finding of the City Commission that many other alternative channels of communication (other than right-of-way canvassing and solicitation on the prohibited roadways) exist for persons who seek to exercise their First Amendment freedoms, such as, but by no means limited to, solicitation of funds or distribution of literature through the mail or at alternate locations (such as houses of worship, shopping areas and special events); the sale and/or distribution of newspapers through home or office delivery; vending machines and retail stores, and the sale of goods and services at retail stores, through the internet and from vending machines; and

(m)    The City Commission desires to preserve and protect personal safety and quality of life of its residents and of those who use streets within the City, both pedestrians and motorists alike; . . . .

D.E. 1-3 at 9-11.

Prior to the enactment of the Ordinance, the City Commission directed the City's Planning and Zoning Board to study the issue of street vendors. D.E. 23-2 at 2. According to Former Pembroke Pines Police Department Captain Sean Hemingway, he was appointed to serve as the Police Department representative "to coordinate with the City's professional staff and the City Attorney's Office as well as to conduct studies and analyses related to the Issue." D.E. 23-3 at ¶ 6. Captain Hemingway further attested that, as the Police Department's representative, he coordinated the following:

a) Provided statistics to the City's Planning Division for their analysis of the number of traffic accidents at certain intersections within the City from 2005-2010.

b) An assessment of the safety risks of having pedestrians in the medians on heavily travelled [sic] roads.

c) A review of the data on crash statistics involving pedestrians killed on Florida roadways, including sixty-five (65) pedestrians killed on roadways in Broward County, with fatalities in the City of Pembroke Pines.

d) A review of statistics which demonstrate that South Florida is among the most dangerous pedestrian areas in the country.

e) A review of documentation which revealed that 43 right-of-way canvassers had been seriously injured or killed, many while sitting or standing in a median or close to the roadway, including three (3) South Florida newspaper vendors.

*Id.* at 2-3. In addition, Captain Hemingway stated that he spoke on multiple occasions with representatives from the City's Planning Division and the City Attorney's office to discuss the findings and results of his analytical research on right-of-way canvassing and soliciting. *Id.* at ¶¶ 8,9. Upon reviewing the documentation and identifying which roadways had the highest traffic volume and the highest risk of accidents, Captain Hemingway opined that the roadways included in the

Ordinance "were recommended in an effort to best protect public safety, including the safety of canvassers and solicitors as well as motorists." *Id*. at ¶ 11.

City of Pembroke Pines City Engineer Joseph McLaughlin has attested that the City has 466 miles of public roadways.  D.E. 7-1.  Of those, the six roads on which the Ordinance prohibits hand-to-hand canvassing and soliciting constitute less than 10%.  *Id.*

Subsequent to the enactment of the Ordinance, The Homeless Voice contends, the City of Pembroke Pines advised The Homeless Voice that any violation or attempted violation of the Ordinance would be enforced against it. D.E. 1, ¶ 12.

### *Summary Judgment Standard*

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party."  *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).  A fact is material if it "might affect the outcome of the suit under the governing law." *Id*. (quoting *Anderson*, 477 U.S. at 247-48).

On a motion for summary judgment, the Court views the evidence, including all reasonable inferences drawn from it, in the light most favorable to the non-moving party and resolves all reasonable doubts against the movant.  *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008); *Johnson v. City of Mobile*, 321 F. App'x 826, 830 (11th Cir. 2009).  The Court does not weigh conflicting evidence.  *Skop v. City of Atlanta*, 485 F.3d 1130, 1140 (11th Cir. 2007), *reh'g and reh'g en banc denied*, 254 F. App'x 803 (11th Cir. 2007).  Nor does the Court determine the

credibility of witnesses. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (citation omitted). Upon discovering a genuine material dispute, the Court must deny summary judgment and proceed to trial. *Id*. at 1292.

The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). Once the moving party satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id*. (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Accordingly, the non-moving party must produce evidence beyond the pleadings, and by his own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts suggesting that a reasonable jury could find in his favor. *Shiver*, 549 F.3d at 1343. "A mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (quoting *Anderson*, 477 U.S. at 252).

Local Rule 56.1, S.D. Fla., further factors into this Court's consideration of a motion for summary judgment. Under Local Rule 56.1, a party moving for or opposing summary judgment must submit a "statement of material facts as to which it is contended that there does not exist a genuine issue to be tried or there does exist a genuine issue to be tried, respectively." S.D. Fla. L.R. 56.1(a). The rules require these statements to be supported by "specific references" to evidence in the record. S.D. Fla. L.R. 56.1(a)(2). The Local Rules expressly caution, "All material facts set forth

in the movant's statement filed and supported as required above will be *deemed admitted* unless controverted by the opposing party's statement, provided that the Court finds that the movant's statement is supported by evidence in the record."  S.D. Fla. L.R. 56.1(b) (emphasis added).  But even where an opposing party neglects to submit any alleged material facts in controversy, the court must still satisfy itself that the evidence on record supports the uncontroverted material facts that the movant has proposed.  *Reese v. Herbert*, 527 F.3d 1253, 1268-69, 1272 (11th Cir. 2008); *United States v. One Piece of Real Prop. Located at 5800 S.W. 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1103 n. 6 (11th Cir. 2004).

### *Discussion*

### I.   Claims Against Dan Giustino in His Official Capacity as Pembroke Pines Chief of Police

Pembroke Pines Police Chief Dan Giustino moves to dismiss Plaintiff's claims against him, arguing that the claims are "redundant and improper since a suit against him in his official capacity is another way of suing the City, which is already a party." D.E. 8 at 2.  Plaintiff has offered no argument in response.

The Court agrees with Police Chief Giustino that the claims against him, which are brought against him in his official capacity only, are indeed redundant and unnecessary.  As the Supreme Court has explained, "Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (quoting *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 690 n.55 (1978)); *see also Owens v. Fulton County*, 877 F.2d 947, 951 n.5 (11th Cir. 1989) ("For liability purposes, a suit against a public official in his official capacity is considered a suit against the local government

10

entity he represents."); *see also Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991)

("Because suits against a municipal officer sued in his official capacity and direct suits against

municipalities are functionally equivalent, there no longer exists a need to bring official-capacity

actions against local government officials, because local government units can be sued directly.")

(citing *Graham*, 473 U.S. at 166; *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985)).  Consequently,

Plaintiff's claims against Defendant Giustino are dismissed because Plaintiff has sued the City of

Pembroke Pines, the relevant municipality, on the same grounds.

## II.    Evidentiary Challenges to Defendant City's Motion for Partial Summary Judgment[3]

In challenging Defendant City's Motion for Partial Summary Judgment, Plaintiff first argues

that summary judgment should be denied because "Defendant has provided the Court with no

admissible evidence in support of its [Motion], inasmuch as the two affidavits relied on by the

Defendant are defective and constitute impermissible hearsay."  D.E. 28 at 2.  Specifically, The

Homeless Voice seeks for the Court to strike from the record the affidavits of Pembroke Pines City

Engineer Joseph McLaughlin and former City of Pembroke Pines Police Department Captain Sean

Hemingway.  *See id.* at 11-14.  Plaintiff contends that the Court cannot consider these affidavits in

ruling on Defendant's Motion because the affidavits do "not demonstrate [that the] affiant has

---

[3]Plaintiff also argues that the City' request for summary judgment should be summarily
denied because it is "procedurally defective" in that it "does not affirmatively assert that there are
no disputed material facts or that there are genuine issue(s) of triable fact."  D.E. 28 at 4, 1; *see
also id*. at 6.  But there are no magic words that a party must invoke in order to establish that no
material issues of fact exist.  Here, the City has submitted its Statement of Material Facts Not in
Issue, supported by evidence discussed elsewhere in this Order.  The Court has carefully
reviewed these materials, as well as Plaintiff's filings and finds that the record presents no
material issues of fact.  That is all that is required.  *See* Fed. R. Civ. P. 56(c) (the moving party
must "*show* that there are no genuine issues of material fact and that the moving party is entitled
to judgment as a matter of law.") (emphasis added).

personal knowledge of factual assertions [and instead] contain[] only conclusory allegations. *Id*. at 11.

In general, courts may not consider inadmissible hearsay on a motion for summary judgment. *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999). With respect to affidavits specifically, Rule 56(e), Fed. R. Civ. P., states that an affidavit "shall be made on personal knowledge, shall set forth facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to matters stated therein." Fed. R. Civ. P. 56(e). To the extent that any affidavit constitutes hearsay, the Court may not consider it for summary-judgment purposes unless its content would be admissible at trial for some purpose.

A.    Affidavit of Joseph McLaughlin

Plaintiff objects to the portion of McLaughlin's Affidavit that states, "The City of Pembroke Pines has approximately 466 miles of public roadways. The roadways on which canvassing and soliciting is prohibited pursuant to the City Ordinance . . . comprise less than 10% of the public roadways within the City." D.E. 7-1 at 1-2. Although Plaintiff acknowledges that McLaughlin testifies in the sworn affidavit that he has "personal knowledge" of these facts, Plaintiff contends without explanation that "the Affidavit does not 'affirmatively demonstrate' that Mr. McLaughlin has any personal knowledge of the factual assertion . . . ." D.E. 28 at 11.

The Court disagrees. Plaintiff points to nothing casting any doubt on McLaughlin's assertion that he has "personal knowledge of the facts set forth" in the Affidavit. To the contrary, the Affidavit attests that McLaughlin "is employed by the City of Pembroke Pines as the City Engineer," a position with responsibilities requiring knowledge of a city's roads. D.E. 7-1 at 1. Thus, the Court denies Plaintiff's request to strike McLaughlin's Affidavit.

B.      Affidavit of Captain Sean Hemingway

Plaintiff also objects to the Affidavit of Captain Sean Hemingway, who was appointed "as the Police Department's representative to coordinate with the City's professional staff and the City Attorney's Office to conduct studies and analyses relating to this matter [of right-of-way canvassing and soliciting on Pembroke Pines streets]."  D.E. 23 at 2.  In particular, Plaintiff asserts that Captain Hemingway's Affidavit does not establish that he has personal knowledge of the facts stated within it, noting that Hemingway "merely asserts that he has 'information pertaining to the above-styled action,'" not that he possesses personal knowledge of the matters to which he attests in the Affidavit. D.E. 28 at 12; *see also* D.E. 23-3 at 1 ("This affidavit is given on the basis of the Affiant having information pertaining to the above-styled action.").

The Homeless Voice further challenges Captain Hemingway's statements regarding the data, studies, and investigations conducted by the Police Department and provided to the City as part of the City's efforts to research issues associated with right-of-way canvassing and soliciting.  *See* D.E. 28 at 12-13.  According to Plaintiff, "not once does Captain Hemingway state that he himself performed any of the investigations, reviewed or compiled any of the statistics, data or documentation. Nor does Captain Hemingway make any affirmative statement that he has personal knowledge of any of the investigations, data, statistics, documentation or reports that he is testifying to in his affidavit." *Id*. at 13.  Based on these alleged infirmities, Plaintiff submits that the Affidavit should be stricken. *Id*. at 14.

An affidavit stating that the affiant is testifying based upon "information and belief" is insufficient as a matter of law with respect to the requirement that affidavits proffered in support of a summary judgment motion must be based upon personal knowledge.  *Automatic Radio Mfg. Co.*

13

*v. Hazeltine Research*, 339 U.S. 827, 831 (1950); *see also Pittman v. Tucker*, 213 F. App'x 867, 870 (11th Cir. 2007) (quoting *Pace v. Capobianco*, 283 F.3d 1275, 1278 (11th Cir. 2002) ("allegations in affidavits must be based on personal knowledge, and not be based, even in part, 'upon information and belief'").  While Captain Hemingway's Affidavit does not expressly state that it offers testimony upon information and belief, at first blush, Captain Hemingway's Affidavit might nonetheless appear that it suffers from same flaw as affidavits based solely on information and belief.  Indeed, the Affidavit indicates that Captain Hemingway's statements are "given on the basis of the Affiant having information pertaining to the above-styled action."  D.E. 23-3 at ¶ 1.

Upon closer inspection, however, the Court finds that the substance of Captain Hemingway's testimony affirmatively establishes that he has personal knowledge of the facts to which he attests. After stating that he was personally appointed "to conduct studies and analyses related to the Issue [regarding canvassers and right-of-way solicitors]," Captain Hemingway continues,

> 8.    I met on multiple occasions, in person and by telephone with representatives from the City's Planning Division to discuss the findings and results of the various analyses of the Issue.
>
> 9.    I met on multiple occasions, in person and by telephone with representatives from the City Attorney's Office to discuss the findings and results of the various analyses of the Issue.
>
> 10.   The corridors included within the Ordinance were specifically identified during the analyses as potentially dangerous roadways with a high volume of traffic.
>
> 11.   After review of the documentation, the specific corridors included in the Ordinance were recommended in an effort to best protect public safety, including the safety canvassers as well as motorists.

D.E. 23-3 at 3.  Based on Captain Hemingway's assertions that he himself, as the Police Department

14

representative, met on multiple occasions with officials from both the City's Planning Division and the City Attorney's Office to discuss the findings and results of the various analyses that he was directed to conduct on the issue of right-of-way solicitors and canvassers, the Court concludes that Captain Hemingway's Affidavit attests to actions that Captain Hemingway personally took and of which Captain Hemingway has personal knowledge.  In addition, the Court finds that, as the Police Department representative directed to undertake the analyses provided to the City, and further, as the Police Department representative who met with City officials to convey and discuss the findings of the analyses, Captain Hemingway obviously has personal knowledge of the contents of the analyses, as described in paragraph 10 of his Affidavit, or else he could not have "discuss[ed] the findings and results of the various analyses" with City officials on "multiple occasions."  *See id.* at ¶¶ 8-10.  And, as the Police Department representative involved in the discussions of the analyses with City officials, Captain Hemingway plainly has personal knowledge of the recommendations that the Police Department made to the City.  *See id.* at ¶ 11.  Thus, the Court declines to strike Captain Hemingway's Affidavit for lack of personal knowledge.

## III.    First Amendment Challenges to the Ordinance

Turning now to the merits, Plaintiff's primary challenge to the City's Ordinance arises under the guarantees of freedom of speech contained in the First Amendment to the United States Constitution.[4]  The Homeless Voice first argues that the Ordinance is unconstitutionally overbroad.  *See* D.E. 1 at 5.  At the same time, though, Plaintiff contends that the Ordinance is underinclusive

---

[4] The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press[.]" U.S. Const. amend. I.  The First Amendment is applicable to the states through the Fourteenth Amendment to the United States Constitution.  *See, e.g.*, *Mills v. Alabama*, 384 U.S. 214, 218 (1966).

and that this underinclusiveness shows that the regulation is not content neutral and cannot be upheld under the applicable standard for judicial scrutiny. *See* D.E. 28 at 17-18. Alternatively, The Homeless Voice argues that, even if the Ordinance is found to be content neutral, it cannot be upheld as a reasonable time, place, or manner regulation of protected speech. *See id.* at 14-18.

Defendant City does not dispute that The Homeless Voice's dissemination of its newspaper and solicitations of charitable donations are protected by the First Amendment. Rather, Defendant moves for summary judgment in its favor on the basis that the Ordinance is, as a matter of law, constitutional under the First Amendment as a reasonable time, place, and manner restriction on speech. *See* D.E. 7; D.E. 17.

In evaluating claims for First Amendment violations, the Court must first consider whether the activity in question constitutes protected speech under the First Amendment. *See, e.g.*, *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985) ("[I]f [the speech] is not [protected], we need go no further."); *see also DA Mortg., Inc. v. City of Miami Beach*, 486 F.3d 1254, 1265-66 (11th Cir. 2007) ("As a threshold matter, we must ask whether the First Amendment protects the conduct at issue in the challenged ordinance."). If the speech is protected, the Court "must identify the nature of the forum" to determine the level of constitutional scrutiny that applies to the speech, "because the extent to which the Government may limit access [to the forum] depends on whether the forum is public or nonpublic." *Cornelius*, 473 U.S. at 797; *see also Gold Coast Publ'ns, Inc. v. Corrigan*, 42 F.3d 1336, 1344 (11th Cir. 1994) ("The validity of restrictions on protected First Amendment expression depends on the type of speech and the type of forum being regulated."). Finally, the Court "must assess whether the justifications for exclusion [of speech] from the relevant forum satisfy the requisite standard." *Cornelius*, 473 U.S. at 797.

16

A.     Plaintiff's Activities Constitute Speech Protected by the First Amendment

The First Amendment protects Plaintiff's activities at issue in this matter.  First, it is firmly established that the distribution of Plaintiff's newspaper, *The Homeless Voice*, "is a type of speech protected by the First Amendment."  *Int'l Caucus of Labor Comm. v. City of Montgomery*, 111 F.3d 1548, 1550 (11th Cir. 1997); *see also Lovell v. Griffin*, 303 U.S. 444, 452 (1938) (holding that the right to circulate literature is as essential to the freedom of the press as the right to publish).  The Supreme Court has also made clear that the First Amendment protects the solicitation of charitable donations.  *See, e.g.*, *Village of Shumberg v. Citizens for a Better Environment*, 444 U.S. 620, 632 (1980) (holding that "[p]rior authorities, therefore, clearly establish that charitable appeals for funds, on the street or door to door, involve a variety of speech interests — communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes — that are within the protection of the First Amendment"); *see also Sec'y of State of Md. v. Munson Co.*, 467 U.S. 947, 959 (1984) ("charitable solicitations are so intertwined with speech that they are entitled the to the protections of the First Amendment").  Thus, the Ordinance regulates expressive activity protected by the First Amendment.

B.     The Ordinance Regulates Speech in Traditional Fora

Under the prevailing constitutional framework, speech restrictions imposed by the government on property that it owns are analyzed under a "forum based" approach.  *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 6887 (1992) (noting that many prior Supreme Court opinions reflect "a 'forum based' approach for assessing [speech] restrictions that the government seeks to place on the use of its property").  As the Supreme Court explained, "To ascertain what limits, if any, may be placed on protected speech, we have often focused on the

17

'place' of that speech, considering the nature of the forum the speaker seeks to employ. Our cases have recognized that the standards by which limitations on speech must be evaluated 'differ depending on the character of the property at issue.'"). *Frisby v. Schultz*, 487 U.S. 474, 479 (1988) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983)). Under this framework, the Supreme Court has identified three types of fora: "the traditional public forum, the public forum created by government designation, and the nonpublic forum." *Frisby*, 487 U.S. at 479-80 (quotation omitted).

The Ordinance states that "[i]t shall be unlawful for any person to act as a right-of-way canvasser or solicitor on Pines Boulevard, Pembroke Road, University Drive, Sheridan Street, Dykes Road and Flamingo Road or within 200 feet from the lateral curb or boundary line of any intersection located on the roadways identified in this subsection." D.E. 1-3. Thus, the Ordinance regulates speech on certain City streets and on portions of City sidewalks, since some sidewalks are encompassed by the Ordinance's ban on canvassing and solicitation "within 200 feet from the lateral curb or boundary line of any intersection located on" one of the six named roadways. *Id.*

The Supreme Court has "repeatedly referred to public streets as the archetype of a traditional public forum" and "'time out of mind,' public streets and sidewalks have been used for public assembly and debate, the hallmarks of a traditional public forum." *Frisby*, 487 U.S. at 480 (citations omitted); *see also Int'l Caucus of Labor Comms.*, 111 F.3d at 1550 ("A sidewalk, although specifically constructed for pedestrian traffic, also constitutes a public forum."). Therefore, the streets and sidewalks of the City of Pembroke Pines are traditional public fora, and Ordinance 1734 must be evaluated against the standards established for restrictions of speech in this type of forum.

18

C.    Time, Place, and Manner Restrictions of Speech in Public Fora

As previously noted, the City responds to Plaintiff's First Amendment claims by arguing that, as a matter of law, the Ordinance "does not run afoul of the U.S. Constitution" because it is a reasonable time, place, and manner regulation of speech.  D.E. 7 at 2.

The City correctly recognizes that, even when protected speech in a public forum is involved, the government may impose reasonable restrictions on the time, place, or manner of protected speech.  *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).  Time, place, and manner restrictions on speech must meet three requirements to withstand a constitutional challenge.  They must be content-neutral; they must be narrowly tailored to serve a significant governmental interest; and they must leave open "ample alternative channels for communication of the information.'"  *Id*. (citations omitted).

In the instant case, the parties dispute whether the Ordinance meets each of the three elements of this test.  For the reasons that follow, the Court finds that the Ordinance is a permissible time, place, and manner restriction on protected speech and that it is constitutional as a matter of law.

1.    *The Ordinance is Content Neutral*

A speech restriction is content neutral if it is "justified without reference to the content of the regulated speech."  *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984).  "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of a disagreement with the message it conveys."  *Ward*, 491 U.S. at 791; *see also Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1259 (11th Cir. 2005) (in determining whether an ordinance is content neutral, courts generally look to the language of the ordinance to see if it "distinguish[es]

19

disfavored speech on the basis of the ideas or views expressed") (quoting *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 643 (1994)).  Thus, even if a regulation incidentally affects some speakers or messages but not others, it nonetheless qualifies as content-neutral if it serves purposes unrelated to the content of the expression.  *Ward*, 491 U.S. at 791.

The Ordinance is content neutral on its face.  Because the Ordinance makes it "unlawful for *any person* to act as a right-of-way canvasser or solicitor" on the six delineated roadways, the Ordinance applies evenhandedly to all those who wish to "sell[] or offer[] for sale any thing or service of any kind, or who seek[] any donation of any kind, or . . . hand[] or seek[] to transmit by hand or receive by hand any thing or service of any kind" to a motorist.  D.E. 1-3 at 8-9 (emphasis added); *see also Heffron*, 452 U.S. at 649 (finding a time, place, and manner restriction was content neutral where it "applie[d] evenhandedly to all who wish[ed] to distribute and sell written materials or to solicit funds.  No person or organization, whether commercial or charitable, [wa]s permitted to engage in such activities except from [the place restriction]"); *Ass'n of Cmty. Org. for Reform Now v. St. Louis County*, 930 F.2d 591, 593 (8th Cir. 1991) (finding content-neutral and upholding an ordinance stating, "No person shall stand in a roadway for the purpose of soliciting a ride, employment, charitable contribution or business from the occupant of any vehicle"); *Int'l Soc'y for Krishna Consciousness of New Orleans, Inc. v. City fo Baton Rouge*, 876 F.2d 494, 496-97 (5th Cir. 1989) (finding content-neutral and, ultimately constitutional, an ordinance providing, "[N]o person shall be upon or go upon any street or roadway . . . for the purpose of soliciting employment, business, or charitable contributions of any kind from the occupant of any vehicle").  For example, under the Ordinance, members of The Homeless Voice, the Girl Scouts and Boy Scouts, the local high-school football team, and the Ku Klux Klan are all barred from canvassing or soliciting on the

prohibited roadways, irrespective of their diverse viewpoints or the informational content of their messages.  Because the Ordinance does not "distinguish disfavored speech on the basis of the ideas or views expressed," *Solantic*, 410 F.3d at 1259 (citation omitted), it is content neutral.

Nor, as Plaintiff suggests, does the Ordinance somehow lose its content-neutral status because it allegedly "leav[es] similar 'distracting' forms of speech unregulated."  D.E. 28 at 17.  In complaining that the Ordinance is not content neutral because it is underinclusive, Plaintiff notes that, while the Ordinance prohibits The Homeless Voice from interacting with motorists to distribute its newspaper and solicit donations on the designated streets, under the express terms of the Ordinance, "[p]edestrians could within clear view of the roadway interact with vehicle occupants by holding up signs, advertisement, and etc." *Id.*; *see also* D.E. 1-3 at 9 ("The term [right-of-way canvasser or solicitor] shall not apply to any person who merely holds or displays a sign lawfully permitted to be displayed by a person as long as there is no entry by such person into any portion of the roadway or median.").  According to Plaintiff, "The failure of the Ordinance to regulate other forms of expressive speech that could be the cause of similar alleged disruptions to traffic or distractions to drivers calls into question the City's motivation in enacting the Ordinance" and gives rise to the conclusion that "[t]he Ordinance is a content based regulation of speech . . ." deserving of strict scrutiny by the Court.  D.E. 28 at 18.

While the underinclusiveness of a speech regulation often is not an independent ground for invalidating a speech restriction, *see R.A.V. v. City of St. Paul*, 505 U.S. 377, 387 (1992), in some cases, the underbreadth of a law — that is, the failure of the regulation to eliminate all conduct posing the threat that the government purports to address — may indicate that the government is in fact discriminating on the basis of content or that its asserted government interest is not truly

21

pressing.  *See City of Ladue v. Gilleo*, 512 U.S. 43, 52-53 (1994) ("Exemptions from an otherwise legitimate regulation of a medium of speech may be noteworthy for a reason quite apart from the risks of viewpoint and content discrimination: They may diminish the credibility of the government's rationale for restricting speech in the first place."); *see also Brown v. Entm't Merchs. Ass'n*, ___ U.S. ___, 131 S. Ct. 2729, 2740 (2011) ("Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint.").

Here, however, that is not the case.  Significantly, the speech permitted under the Ordinance differs in a non-content way from the speech that is subject to the Ordinance's time, place, and manner restrictions.  Specifically, while the ordinance prohibits anyone from "personally ***hand[ing]*** or seek[ing] to ***transmit by hand*** or ***receive by hand*** any thing or service of any kind . . . to any person who operates or occupies a motor vehicle . . ." on any of the six designated streets, D.E. 1-3 at 8-13 (emphasis added), on those same streets, it allows speech that does not involve hand-to-hand distribution or receipt of anything.  Thus, as long as speech of any content does not contain a hand-to-hand component, it is permitted under the Ordinance.

And that fact provides the second reason why the alleged underinclusiveness of the Ordinance does not reveal an intent on the part of the City to censor particular messages: nothing prevents The Homeless Voice and its members from continuing to convey their same message on the streets in question, as long as they do so in a manner that does not involve hand-to-hand techniques.

Third, while, as Plaintiff argues, there can be no doubt that standing with signs on the side of busy roads can be distracting to drivers, actually walking into busy, multiple-lane roads to

22

exchange materials with drivers on those roads introduces an entirely new dimension of hazard to the people canvassing, the people driving, and the people on the sidewalks who might be injured by a vehicle whose driver was distracted by the presence of a person in the street. The City's choice to address only the particular hazard created by entry of canvassers and solicitors into the roadway without seeking to prevent all conceivable distractions on six of the City's busiest roads does not somehow render the Ordinance content based. *See Burson v. Freeman*, 504 U.S. 191, 207 (1992) ("We do not, however agree that the failure to regulate all speech renders the statute fatally underinclusive.").

Besides the fact that Ordinance itself does not reveal an intent to discriminate against any particular message, the only evidence of record indicates that the City enacted the Ordinance for content-neutral safety reasons. First, the City of Pembroke Pines specifically denies "[a]ny contention by Plaintiff that the City's motivation [was] to suppress advocacy for homeless individuals." D.E. 7 at 6. And, while a mere denial, in and of itself, is hardly sufficient to establish the lack of an improper purpose, here, the City submits evidence of its permissible purpose in enacting the Ordinance.

Second, the evidence that the City submits in support of its position shows nothing to suggest anything other than that the City chose to enact the Ordinance out of safety concerns. In this regard, Captain Hemingway attests that he was directed to assist in the coordination of obtaining statistics regarding the number of traffic accidents at certain intersections within the City, assessing the safety risks attendant with the presence of pedestrians in the medians on "heavily travel[]ed roadways," and reviewing the data on crash statistics on Florida, and particularly, Broward County roadways. D.E. 23-3 at ¶ 7. He further states that he, in fact, completed these tasks and advised City officials of the

23

findings of the analyses.  *Id.* at ¶¶ 7-9.

Third, it is apparent that Captain Hemingway conveyed information regarding traffic-accident statistics and safety to the City because the Ordinance makes express findings that rely on the information that Captain Hemingway attests that he provided to the City.  *See* D.E. 1-3 at 9-12. Among such information, the Ordinance points out that, while not specific to Pembroke Pines in particular, Broward County, where Pembroke Pines is located, suffered sixty-five pedestrian fatalities in 2007, and the Miami-Fort Lauderdale area, of which Pembroke Pines is roughly in the middle, is "one of the most dangerous areas in the United States for pedestrians," based on statistics collected by the Surface Transportation Policy Project. *Id.* at 9.  As for Pembroke Pines specifically, the Ordinance notes that two pedestrians died  in 2006.  In addition, the Ordinance recognizes that the six roads named in the Ordinance are "major roads within the City" and finds that, based on analyses conducted, they constitute "an increased and significant danger for use . . . and pose the greatest threat to traffic and public safety . . . ."[5]  *Id.* at 11.

Similarly, the Ordinance's Preamble explicitly states that "[t]he City Commission desires to adopt an ordinance restricting right-of-way canvassers and solicitors to certain streets and roadways located in the city *because such canvassers and solicitors pose a danger to themselves and the public*

---

[5]In support of their Motion for Summary Judgment, Defendants also submit data from www.city-data.com/accidents/acc-Pembroke-Pines-Florida.html that show that multiple fatal accidents — indeed, nearly all of Pembroke Pine's such accidents over the past several years — have occurred at an intersection involving one of the six roads identified in the Ordinance.  *See* D.E. 23-6 at 2 (showing ten of twelve fatal accidents in Pembroke Pines in 2009 involved such an intersection and nine of eleven fatal accidents in Pembroke Pines in 2008 involved such an intersection).  While the City apparently includes these statistics to show the dangerousness of the roads in question and, thus, the need to reduce unnecessary distraction, the Court does not consider this evidence because it is not authenticated, and it is not clear from the Ordinance, from Captain Hemingway's Affidavit, or from any other part of the record that the City actually relied on this particular iteration of data at the time that it enacted the Ordinance.

*at large* by interfering with the safe movement of normal vehicular traffic." D.E. 1-3 at 9 (emphasis added); *see Ranch House v. Amerson*, 238 F. 3d 1273, 1280 (11th Cir. 2001) ("In determining whether the purpose of a law is to suppress protected speech, a court may examine a wide variety of materials, including the text of the statute, any preamble or express legislative findings associated with it, legislative history, and studies and information of which legislators were clearly aware.").

Against this evidence of the City's purpose in enacting the Ordinance, Plaintiff simply states conclusorily that the "the City enacted the Ordinance because it disagrees with the message conveyed by [T]he Homeless Voice" and that "[t]he evidence will show that the "Interest" of the City in enacting this ordinance" was "to keep the [h]omeless out of sight and off the public streets in Pembroke Pines." But Plaintiff has not presented the Court with even a "scintilla" of evidence to support its contentions. D.E. 28 at 18, 1.

Even Plaintiff's reliance on the Affidavits of Miles E. Moss, Robert Hazen, and Arthur Goncalves do not contradict the City's evidence that it enacted the Ordinance in the interest of safety. Plaintiff's expert, Moss, holds his Master of Science in civil engineering, having majored in traffic engineering. D.E. 29-1 at 41. His professional experience includes forty-two years "on a management and supervisory level in traffic engineering, conducting traffic operations studies." *Id.* Essentially, Moss attests that pedestrian accidents happen for a variety of reasons, and most pedestrian accidents do not involve roadway solicitors. *See id.* at 5-6. Moss further opines that solicitation in roadways may be done in a relatively safe manner. While the Court does not doubt Moss's conclusions, they do not create a material issue of fact regarding the City's intent in enacting the Ordinance. As the City's findings reflect, the City was not concerned solely about the safety of roadway solicitors; it was also worried about the safety of drivers and others using the six busy

roadways.  And Moss's report does not even purport to address the safety hazards posed to drivers and others on the roadways when canvassers and solicitors enter busy roadways to distribute and receive materials.

Similarly, Hazen, a former fire-prevention officer for the City of Hollywood, asserts that when he was a fire-prevention officer, he participated in roadway solicitation.  D.E. 29-2 at ¶ 2. Hazen further attests that in his more than twenty years of participating once a year in roadway solicitations, he has never witnessed any accident where he or any of his coworkers were hit by a car or caused a traffic accident.  *Id.* at ¶ 3.  Finally, Hazen, like Moss, suggests that roadway solicitation can occur in a "safe manner."  *Id.* at ¶ 5.  But the mere fact that Hazen was fortunate enough not to have experienced or witnessed an accident in his annual roadway solicitations in a city different from the City of Pembroke Pines does not in any way make it any less likely that the City of Pembroke Pines enacted the Ordinance to protect the safety of people within the City's borders.

Turning to Goncalves, he states that all solicitors employed by The Homeless Voice are well trained and screened to ensure their utmost safety.  *See* D.E. 29-3.  Again, though, this fact does nothing to suggest — let alone demonstrate — that the City enacted the Ordinance in an effort to sensor the message of The Homeless Voice.

Finally, the Court is mindful of the fact that the Supreme Court has shown great reluctance to make First Amendment-related speculations on allegedly hidden motives of legislative bodies. *See, e.g., United States v. O'Brien*, 391 U.S. 367, 383 (1968) ("It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive. . . . Inquiries into congressional motives or purposes are a hazardous matter.").  Given that The Homeless Voice has provided no evidence contradicting the

City's demonstration that it did not enact the Ordinance for illicit purposes, Plaintiff's claim that the Ordinance is content based rests on little more than unsupported speculation and does not cast doubt on the content-neutral character of the law.

In short, the record heavily supports the City's contention that it enacted the Ordinance for the content-neutral reason of protecting the safety and welfare of people in and passing through the streets of Pembroke Pines. Nothing — including the fact that the Ordinance does not seek to remedy every conceivable type of driving distraction created by First Amendment activity — betrays an intent by the City to limit Plaintiff's message based on its content. The Supreme Court "frequently has upheld underinclusive classifications on the sound theory that a legislature may deal with one part of a problem without addressing all of it." *Erznoznik*, 422 U.S. at 215 (citation omitted); *see also City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) ("Legislatures may implement their program step by step . . . adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations."). The record shows that the Ordinance is content neutral and was not enacted to sensor any particular group's message, including that of The Homeless Voice.

      2.    *The Ordinance is Narrowly Tailored to a Significant Government Interest*

The Court next considers whether the Ordinance is narrowly tailored to achieve a significant government interest.

      a.    <u>Significant Government Interest</u>

Defendant avers that it enacted the Ordinance in order to protect and promote its "interest in providing safe roadways and free-flow of traffic for pedestrians and motorists alike." D.E. 7 at 13. Further, it contends that such interests are constitutionally significant. *See id*. The Court agrees.

It is firmly established that a city's interest in protecting its citizens and ensuring that its streets and sidewalks are safe for everyone is constitutionally significant.  *See, e.g., Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 508-09 (1981) (plurality opinion) (finding that ensuring "traffic safety" is a "substantial government goal[]" and noting that "[i]t is far too late to contend otherwise," based on early Supreme Court precedents) (citing *Ry. Express Agency, Inc. v. New York*, 336 U.S. 106 (1949)); *see also Cox v. New Hampshire*, 312 U.S. 569, 574 (1941) ("The authority of a municipality to impose regulations in order to assure the safety and convenience of the people in use of public highways has never been regarded as inconsistent with civil liberties but rather as one of the means of safeguarding the good order upon which they ultimately depend.  The control of travel on the streets of cities is the most familiar illustration of this recognition of social need.").  Moreover, the Supreme Court has recognized the substantial risk of disruption in crowd and traffic control that may be presented by solicitation and literature sales, as compared to other forms of expression.  *See Heffron*, 452 U.S. at 653 (noting that solicitation and selling require "stopping [individuals] momentarily or for longer periods as money is given or exchanged for literature.").

Here, Plaintiff does not challenge the significance of the government's interest in citizen safety and avoiding traffic congestion.  Instead, Plaintiff disagrees that the City has sufficiently demonstrated that the Ordinance will mitigate safety and traffic concerns and questions "whether canvassing and soliciting in public roadways creates a public safety concern." D.E. 28 at 7-8.

In the context of a First Amendment challenge, "[w]hen the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured.  It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in

28

a direct and material way." *Turner*, 512 U.S. at 654 (citations and internal quotation marks omitted); *see also id.* ("[A] regulation perfectly reasonable and appropriate in the face of a given problem may be highly capricious if that problem does not exist.") (citation and internal quotation marks omitted). This standard, however, has never required scientific or statistical proof of the wisdom of the legislature's course. *Ginsberg v. New York*, 390 U.S. 629, 642 (1968) ("We do not demand of legislatures 'scientifically certain criteria of legislation.'") (quoting *Noble State Bank v. Haskell*, 219 U.S. 104, 110 (1911).

Indeed, Eleventh Circuit precedent is clear that in order to demonstrate the significance of its interest in the context of a First Amendment challenge, "the City is not required to present detailed evidence." *Int'l Caucus of Labor Comm.*, 111 F.3d at 1551 (holding, in the context of a First Amendment challenge to a city policy banning tables from city sidewalks that it was not necessary for the city "to present detailed evidence of pedestrian or traffic flow on or around specific sidewalks" in order to prove its interest was significant). Rather, "the City is entitled to advance its interests by arguments based on appeals to common sense and logic." *Id.* (citation and internal quotation marks omitted). As long as legislative judgment on the significance of the government's safety concerns is "not manifestly unreasonable . . . [it] should not be set aside." *Metromedia*, 453 U.S. at 509.

In this case, Plaintiff relies on Moss to argue that data, in fact, show that "accidents involving pedestrians who are in the course of soliciting on the roadways have not caused a significant number of accidents." D.E. 28 at 8. A careful review of Moss's Affidavit, however, reveals that Moss does not offer this opinion that Plaintiffs attribute to him. *See, generally*, D.E. 29-1. Rather, Moss attests only that roadway solicitors are not involved in many accidents involving pedestrians; he does not

29

opine at all regarding the roles of roadway solicitors in the occurrence of all vehicular accidents. *See id*. Nor does he in any way challenge the City's conclusions regarding the dangers and obstacles that roadway solicitors pose to vehicular traffic and traffic flow, respectively — both harms that the City sought to address through enactment of the Ordinance. *See id*. Also conspicuously absent from Moss's Affidavit is any opinion that roadway solicitation is or can be made safe. *See id*. Instead, Moss asserts that, with proper training and attention to safety rules "can be made safer." *Id*. at 6. Thus, the basis for Plaintiff's contention that a material issue of fact exists concerning "whether canvassing and soliciting in public roadways creates a public safety concern," D.E. 28 at 7-8, is lacking.

And, ass for Plaintiff's claim that the data do not show that roadway solicitation has caused a "significant" number of pedestrian accidents, in matters of public safety "[t]he state need not wait for personal injuries" to regulate what is certainly potentially dangerous activity. *United States Labor Party v. Oremus*, 619 F.2d 683, 688 n.4 (7th Cir. 1980) (finding a ban on right-of-way solicitation constitutional); *see also Ass'n of Cmty. Orgs. for Reform Now v. St. Louis Cnty.*, 930 F.2d 591, 596 (8th Cir. 1991) (upholding city restriction on roadway solicitation and finding that "[t]he fact that there was no evidence of [plaintiff's] solicitors being hurt is of no probative value").

Moreover, the City has presented sufficient evidence to demonstrate that "the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner*, 512 U.S. at 654. The City asserts that it acted on the basis of information from a variety of sources, including reports from the Police Department analyzing and mapping traffic accidents at City intersections between 2005 and 2010; Florida Department of Safety and Motor Vehicles data on crashes involving pedestrians in the state (finding that sixty-five

pedestrians were killed in Broward County, with several deaths in Pembroke Pines); and news reports on fatal and non-fatal accidents involving right-of-way canvassers nationwide, which revealed three such accidents that occurred in South Florida and involved roadway newspaper vendors. *See* D.E. 23 at 2-3; *see also* D.E. 1-3 at 9-11 (setting forth in the "Findings; purpose; intent" section the statistics and other evidence the City relied on in assessing the propriety of a ban on right-of-way canvassing and solicitation). Based on these findings and the lack of any evidence that the City relied on them in bad faith, the City was entitled to conclude that prohibiting roadway canvassing and solicitation on its busiest streets would improve motorist and pedestrian safety and traffic flow.

Furthermore, even if the City had not introduced such detailed evidence into the record, "common sense and logic" would still support the City's determination that canvassing and soliciting drivers on heavily trafficked streets presents substantial traffic flow and safety hazards both to pedestrians and motorists. *Int'l Caucus of Labor Comm.*, 111 F.3d at 1551. As one court considering a very similar ordinance observed, "It requires neither towering intellect nor an expensive 'expert' study to conclude that mixing pedestrians and temporarily stopped motor vehicles in the same space at the same time is dangerous." *Int'l Soc'y for Krishna Consciousness of New Orleans v. City of Baton Rouge*, 668 F. Supp. 527, 530 (M.D. La. 1987).

For all of these reasons, the Court declines "to second guess the City's assessment" that right-of-way canvassing and solicitation pose substantial safety and traffic-flow risks that the Ordinance seeks to minimize through its restrictions. *See Gold Coast*, 42 F.3d at 1346 (citing *Metromedia*, 453 U.S. at 508-09 ("We likewise hesitate to disagree with the accumulated, common sense judgments of local lawmakers and of the many reviewing courts that billboards are real and substantial hazards

to traffic safety.")).  As the Supreme Court has stated in a related context,

> We would be trespassing on one of the most intensely local and specialized of all municipal problems if we held that this regulation had no relation to the traffic problem of New York City.  It is the judgment of the local authorities that it does have such a relation.  And nothing has been advanced which shows this is palpably false.

*Ry. Express*, 336 U.S. at 109.  Thus, the Court finds that the Ordinance promotes a constitutionally significant government interest.

### b.   Narrow Tailoring

Although the City has demonstrated that it has a significant interest in regulating right-of-way canvassing and soliciting, the Court must also find that the Ordinance is narrowly tailored in order for it to survive constitutional challenge. Plaintiff argues that the Ordinance is not narrowly tailored because the City has not submitted "studies" showing that *every* intersection along the six regulated roads presents a safety hazard or that the regulation's inclusion of sidewalks within 200 feet of those intersections is necessary.  *See* D.E. 28 at 15.  Plaintiff further contends that because "there are less restrictive means of addressing any legitimate public safety concerns The City may have about canvassers and solicitors on public roadways," the Ordinance is not narrowly drawn.  *Id*. at 15-16.  For example, Plaintiff suggests that the City could address its safety concerns "by requiring solicitors to utilize proper safety attire (vests) and follow[] a prescribed set of safety rules."  *Id*. at 15.

A restriction is narrowly-tailored "so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation."  *Ward*, 491 U.S. at 798.  To be "narrowly tailored," a regulation "need not be the least restrictive or least intrusive means" of accomplishing its purpose.  *Id*.  Rather, a content-neutral regulation may be considered narrowly tailored when it does not "entirely foreclose any means of communication," "even though

it is not the least restrictive or least intrusive means of serving the statutory goal." *Hill v. Colorado*, 530 U.S. 703, 726 (2000) (citing *Ward*, 491 U.S. at 798).

By these measures, the Ordinance is narrowly tailored to serve the City's significant interests in traffic control and citizen safety. It regulates only canvassing and soliciting, and it does so with regard to only six of the City's roadways, or less than 10% of the City's public roads. Significantly, only after "City staff analyzed each of the major roads within its jurisdiction" did the City identify the six streets "where canvassers could pose a particularly increased danger on traffic flow, driver safety and safety of the canvasser." *Id.* at 4; *see also* D.E. 23-3 at 3 ("I met on multiple occasions, in person and by telephone, with representatives from the City Attorney's Office to discuss the findings and results of the various analyses of the [traffic and safety data]. The corridors included within the Ordinance were specifically identified during the analyses as potentially dangerous roadways with a high volume of traffic."). The City made what the Court finds was a reasoned determination that canvassing and soliciting on these few roadways creates a significant risk of traffic flow problems and accidents. "Without second-guessing that judgment, which lies well within the City's discretion," the Court cannot conclude that banning canvassing and soliciting on the six roadways burdens "substantially more speech than is necessary to further the government's legitimate interest." *Smith v. City of Fort Lauderdale, Fla.*, 177 F.3d 954, 956-57 (11th Cir. 1999) (quoting *Ward*, 491 U.S. at 789).

Moreover, the Ordinance's restrictions on canvassing and soliciting "are not rendered unconstitutional by the possible availability of less-speech-restrictive alternatives." *Smith*, 177 F.3d at 957. Again, to be narrowly tailored, the City need not prove that the Ordinance is the least restrictive means of serving its interests. *Ward*, 491 U.S. at 798. Rather, the City "bears the burden

of demonstrating [only] a 'logical and practical relationship between the restriction and [its] interests, so that [the Court] may determine whether the restriction is substantially broader than is necessary to achieve those ends.'" *Coalition for Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1318 (11th Cir. 2000) (quotation omitted).  For the reasons explained above, the Court finds that the City has met this burden.  Consequently, the Ordinance is narrowly tailored to achieve the City's interests.

3.      *The Ordinance Leaves Open Ample Alternative Channels of Communication*

Finally, a reasonable time, place, or manner restriction of protected speech must "leave open ample alternative channels for communication of the information." *Ward*, 491 U.S. at 791. The Ordinance easily satisfies this prong.  As stated, the Ordinance bans right-of-way canvassing and solicitation on less than 10% of the City's total miles of public roadways.  *See Frisby*, 487 U.S. at 483 ("[T]he limited nature of the prohibition [here] makes it virtually self-evident that ample alternatives remain . . . .").  Although Plaintiff argues that "[w]ithout access to the medians and sidewalks of public roadways, Homeless Voice has no forum to disseminate its message," the reality is that the Ordinance leaves open more than 90% of the City's total miles of roadways and sidewalks for individuals to hand out literature and solicit donations.  D.E. 28 at 17.

In addition, Plaintiff may distribute its newspaper and solicit contributions "by going door-to-door, by seeking out people on sidewalks, or by distributing [*The Homeless Voice*] via the mail, email, and news boxes." *The Contributor v. City of Brentwood*, 2013 WL 4081905, at *4 (6th Cir. Aug. 14, 2013) (upholding city's ban on the distribution and sale of literature on all city streets, as challenged by distributors of a newspaper dedicated to covering issues of homelessness and

34

poverty).  Plaintiff has presented no argument that these alternative avenues of communication provide an insufficient means for conveying its message to its intended audience.  In view of these facts, the Ordinance leaves open adequate alternative channels of communication.

D.     The Ordinance is Not Unconstitutionally Overbroad[6]

In Count II of the Complaint, Plaintiff alleges that the Ordinance is overbroad.  *See* D.E. 1 at 5 ("The City of Pembroke Pines Ordinance is unconstitutionally overbroad, and prohibits constitutionally protected speech, expressions and actions. It[]s overbrea[d]th is substantial and is greater than necessary to serve a legitimate government purpose.").  The City contends that it is entitled to summary judgment on Count II of the Complaint because "the averments contained within the four corners of the Complaint fail to show that a substantial amount of protected activity will be chilled by the Ordinance."  D.E. 7 at 9.  Rather, the City argues, "the Ordinance allows soliciting on over 90% of public roadways, i.e. those that were analyzed as not posing a danger by having pedestrians interact with motorists.  Hence it is unlikely that the Ordinance's very existence will

---

[6]In Count III of the Complaint, Plaintiff also mounts a facial challenge to the Ordinance on vagueness grounds.  In this regard, Plaintiff asserts that "[t]he City of Pembroke Pines Ordinance is unconstitutionally vague and abridges Plaintiff's right to [d]ue process of law, a right guaranteed by the [F]ourteenth Amendment to the U.S. Constitution."  D.E. 1 at 5.  Aside from making this single-sentence claim in the Complaint, Plaintiff makes no mention in any of its subsequent filings related to its contention that the Ordinance is unconstitutionally vague. Under Supreme Court precedent, "a claimant asserting that a statute is void for vagueness [must] prove either that the statute fails to give fair notice of wrongdoing or that the statute lacks enforcement standards such that it might lead to arbitrary or discriminatory enforcement." *Konikov v. Orange County, Fla.*, 410 F. 3d 1317, 1329 (11th Cir. 2005) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972). Here, Plaintiff has utterly failed to satisfy this requirement.  In addition, the Court agrees with the City that the Ordinance is not, on its face, unconstitutionally vague.  The Ordinance gives adequate notice to citizens of what activity constitutes a violation and also contains reasonably clear guidelines to prevent official arbitrariness or discrimination in its enforcement.  Accordingly, the Court grants summary judgment in favor of the City on Plaintiff's vagueness claim.

inhibit free expression and, as such, does not fall within the overbreadth doctrine." *Id*. (citation omitted).

The overbreadth doctrine "permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when judged in relation to the statute's plainly legitimate sweep." *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999) (quotations omitted). "Simply put, the doctrine asserts that an overbroad regulation of speech or publication may be subject to facial review and invalidation, even though its application in the instant case is constitutionally unobjectionable." *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 801 n. 19 (1984) (citation omitted). The meaning of "substantial overbreadth" is "not readily reduced to an exact definition. It is clear, however, that the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Id*. at 800. In other words, "there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." *Id*. at 801; *see also Horton v. City of St. Augustine*, 272 F.3d 1318, 1332 (11th Cir. 2001) ("a law is considered facially invalid on this basis only when it is 'substantially overbroad, that is, its application would be unconstitutional in a substantial portion of cases.'") (quoting *Ward v. Cnty. of Orange*, 217 F.3d 1350, 1355 (11th Cir. 2000)). "Thus the issue under the overbreadth doctrine is whether a government restriction of speech that is arguably valid as applied to the case at hand should nevertheless be invalidated to avoid the substantial prospect of unconstitutional application elsewhere." *Vincent*, 466 U.S. at 801 n.19 (citation omitted).

Aside from merely asserting in its Complaint that the Ordinance is substantially overbroad,

36

Plaintiff has not postulated how the Ordinance will inhibit the First Amendment rights of other individuals not presently before this Court.  Instead, The Homeless Voice relies merely on its arguments as to why the Ordinance is not narrowly tailored.  *See* D.E. 28 at 14-16.  In this regard, Plaintiff contends that the Ordinance is "substantially broader than necessary" because the City has not shown that the entire length of each banned road presents a safety hazard for soliciting and because "there are less restrictive means of addressing any legitimate public safety concerns," such as requiring solicitors to wear brightly colored clothing.  *Id.* at 14, 15.

The Court is not persuaded by Plaintiff's arguments.  First, the plain language of the Ordinance does not restrict all protected activity, namely actors who stand on the sidewalk or on the median and who do not solicit funds from motorists.  *See Sun-Sentinel Co. v. City of Hollywood*, 274 F. Supp. 2d 1323, 1332 (S.D. Fla. 2003).  Nor has The Homeless Voice "shown that a substantial amount of protected activity would be swept in the legitimate ambit" of the Ordinance or that "the impact of [the Ordinance] on the conduct of other speakers will differ from its impact on [them] . . . ." *Id.* (quoting *Hill v. Colorado*, 530 U.S. 703, 733 (2000)).  Accordingly, no genuine issue for trial exists on this claim, and the City is entitled to summary judgment on Plaintiff's claim that the Ordinance is unconstitutionally overbroad.

## IV.    Selective Enforcement Challenge to the Ordinance

In Count IV of the Complaint, Plaintiff asserts that the Ordinance "is unconstitutional as applied in that it's [sic] enforcement violates the Plaintiff's Due Process and Equal Protection rights as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. § 1983." D.E. 1 at 5.  According to Plaintiff, "the City prevents the Homeless Voice from soliciting on the roadways while allowing other favored groups to conduct very similar activities on the very

same roadways.   In particular the City's municipal fire fighters who solicit for certain other charitable organizations are allowed to solicit on the roadways." D.E. 28 at 18.  The Homeless Voice claims that "[t]his allegation clearly demonstrate[s] that the City is selectively enforcing their own ordinances." *Id.*

Defendant City has specifically denied Plaintiff's allegation that it selectively enforces the Ordinance, calling Plaintiff's claim a "false contention."   Moreover, as Defendant points out, Plaintiff has provided no evidence to support its argument and has offered mere "conclusory allegations [and] unsubstantiated assertions." *Celotex*, 477  U.S. at 323.  As the City correctly explains,"If, indeed, the City enacted the Ordinance to quell the homeless message and looked the other way for firefighters or other canvassers, then this fact must be established by Affidavit or evidence."   Because Plaintiff has failed to provide even a "scintilla" of evidence supporting its selective-enforcement claim, the City is entitled to summary judgment in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

### *Conclusion*

For the foregoing reasons, Defendant Guistino's Motion for Summary Judgment [D.E. 8] is **GRANTED**, and Defendant City of Pembroke Pines's Motion for Partial Summary Judgment [D.E.

7] is **GRANTED**.

   **DONE AND ORDERED** at Fort Lauderdale, Florida, this 21st day of September 2013.

                                               _____
                                               ROBIN S. ROSENBAUM
                                               UNITED STATES DISTRICT JUDGE

Copies:
Counsel of record